UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | |
|---|---|
| PHYLLISANNE INGLIS, as Trustee of the ) | |
| DAVID M. RATTS Living Trust, Deceased, ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | 1:05-cv-1194-RLY-TAB |
| ) | |
| LIFE INSURANCE COMPANY OF ) | |
| NORTH AMERICA, ) | |
| Defendant. ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

David M. Ratts ("Mr. Ratts") experienced a slip and fall on January 20, 2005, and

died on February 7, 2005.  The Plaintiff, Phyllisanne Inglis ("Plaintiff" or "Ms. Inglis"),

is the Trustee of the David M. Ratts Living Trust.  She brings this claim against the

defendant, Life Insurance Company of North America ("LINA"), in that capacity.  Ms.

Inglis contends that she is entitled to payment by LINA in the amount of $240,000.00

pursuant to LINA's Group Accident Policy No. OK 980032 ("Policy") that was in effect

at the time of Mr. Ratts' slip and fall on January 20, 2005, and his subsequent death on

February 7, 2005.  Specifically, LINA's policy contained an accidental death benefit, and

Ms. Inglis claims that Mr. Ratts' death was a covered loss such that the Trust is entitled to

payment of the accidental death benefit by LINA in the amount of $240,000.  LINA

denies that Mr. Ratts' death was a covered loss, and thus, claims that the Trust is not

entitled to accidental death benefits.

1

A court trial commenced in this case on October 1, 2007, and concluded three days later.  The parties filed their respective Findings of Fact and Conclusions of law on January 25, 2008.  The court now issues its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a):

## FINDINGS OF FACT

### I.     The LINA Policy

1.     Prior to his death, Mr. Ratts was an employee of Indiana University, and was a plan participant in the employee benefit plan sponsored by Indiana University. (Complaint ¶ 2).

2.     Indiana University purchased a Group Accident Policy No. OK 980032 from LINA ("Group Policy") to fund the employee benefit plan Indiana University sponsored.  (*Id*.).

3.     Mr. Ratts was an insured pursuant to the Group Policy and elected a benefit amount of $240,000.00.  (*Id*.).

4.     Mr. Ratts died on February 7, 2005.  (*Id*. ¶ 3).

5.     At the time of his death, Mr. Ratts was 56 years old. (TX 6[1]).

6.     On April 14, 2005, Ms. Inglis, by counsel, requested that LINA make payment in the amount of the applicable death benefit pursuant to the Policy.  (*Id*. ¶ 4).

7.     LINA denied the claim.  (*Id*.; *see also* TX 9).

---

[1] Citations to the trial transcript will be " Tr." followed by "[transcript page];" citations to the trial exhibits will be "TX" followed by the exhibit number.

8.      Ms. Inglis is pursuing this litigation to obtain accidental death benefits under the

Policy.

9.      The specific policy provisions applicable to the facts of this case will be discussed

in the court's Conclusions of Law.  Suffice it to say that the issue in this case turns

upon whether Mr. Ratts' death was an accident within the terms of the Policy –

i.e., whether his death was the result, directly and independently of all other

causes, of the injury Mr. Ratts sustained on January 20, 2005.  Ms. Inglis contends

that the evidence demonstrates that Mr. Ratts' death was more likely than not

caused by a pulmonary embolism and that the pulmonary embolism was more

likely than not caused by the injuries that Mr. Ratts sustained in the slip and fall

and the decreased activity level that resulted therefrom.  Conversely, LINA

contends that Mr. Ratts' death was caused by heart disease that resulted in a

myocardial infarction (or in layman's terms, a heart attack).  Thus, this case turns

upon whether Mr. Ratts died of a heart attack or whether he died of a pulmonary

embolism.

## II.     Events Leading Up to Mr. Ratts' Death

### A.      The Slip and Fall

10.    On January 20, 2005, Mr. Ratts slipped and fell on ice outside his mother's

condominium as he was entering his car to go to work.  (Tr. at 30).  As a result of

the fall, Mr. Ratts injured his back and experienced terrible pain.  (Tr. at 27-28,

32).

11.     That same day, Mr. Ratts saw Dr. Randall Strate ("Dr. Strate"), who was a partner of Mr. Ratts' primary care physician, Dr. Blair Brengle (Dr. Brengle"), at Hoosier Family Health.  (Tr. at 28; TX 4).

12.     Dr. Strate sent Mr. Ratts that same day for an outpatient lumbar x-ray at St. Vincent Hospital.  (*Id*.).

13.     Mr. Ratts stayed with his mother, Mrs. Ratts, as he was in pain and was not able to move well.  (Tr. at 31).

14.     On January 21, 2005, Mr. Ratts returned to St. Vincent Hospital for additional care and treatment for his low back injury.  (Tr. at 32; TX 5).

15.     He remained an inpatient there until his discharge on January 24, 2005.  (*Id*.).

16.     Mr. Ratts continued to experience excruciating low back pain that forced him to remain primarily in bed.  He therefore returned to his mother's condominium so that she could care for him. (Tr. at 33-34, 41, 252-255).

17.     On January 28, 2005, Mr. Ratts called Hoosier Family Health and spoke with Dr. Ashlie Olp ("Dr. Olp"), another partner of Dr. Brengle's, who referred him to Dr. James Hardacker ("Dr. Hardacker"), an orthopedic spine specialist.  (Tr. at 290-91).

18.     Mr. Ratts saw Dr. Hardacker on February 1, 2005.  Dr. Hardacker testified that at the time he saw Mr. Ratts, "[he] was basically in a wheelchair and had troubles even arising from that wheelchair."  (Tr. at 604).  Dr. Hardacker testified that Mr. Ratts informed him that he could ambulate only short distances with a walker at

home and had trouble rolling over in bed.  (Tr. at 633).

19.   Dr. Hardacker confirmed that Mr. Ratts had sustained an L-3 lumbar fracture and

disc herniation as a result of the slip and fall on January 20, 2005.  (TX 1).

20.   Dr. Hardacker referred Mr. Ratts to Dr. Michael Payne, who performed a nerve

root block that same day.  (*Id*.).

21.   Following the procedure, Mr. Ratts returned to his mother's condominium, where,

even after the root block, he remained primarily in bed.  (Tr. at 33-34, 41, 252-

255).

22.   Ellie Sellars ("Ms. Sellars") was a close friend of Mr. Ratts who visited him every

day from the time of his fall until the date of his death.  (Tr. at 33).  Ms. Sellars

testified that during this period of time, Mr. Ratts was in significant pain and spent

approximately 22-23 out of 24 hours a day in bed.  (Tr. at 33-34; 52).  She testified

that she witnessed him walk to the bathroom "a few times," and that it took him

about an hour to accomplish the task.  (Tr. at 33, 43).  Further, Ms. Sellars testified

that in the six months prior to the fall, Mr. Ratts was quite active on a daily basis.

(Tr. at 26).

23.   Ms. Inglis, Mr. Ratts' sister, testified that she visited him nearly every day

following the fall.  (Tr. at 249).  Ms. Inglis, like Ms. Sellars, testified that Mr. Ratts

spent the vast majority of his time in bed.  (Tr. at 253, 255).  She observed him

walk to the bathroom once, which he did "very slowly and with touching – holding

onto things along the way."  (Tr. at 253).  She also testified that he was physically

5

active on a daily basis prior to the slip and fall. (Tr. at 250).

24.    Mr. Ratts returned to see Dr. Olp on February 4, 2005. (TX 2). Dr. Olp testified that Mr. Ratts was in a wheelchair at that time and had very little mobility. (Tr. at 293-94, 312). He was in terrible pain and was having great difficulty taking care of himself. (Tr. at 294, 340-41). Dr. Olp was concerned that Mr. Ratts was not able to provide for his own basic needs; therefore, he ordered a home health evaluation for Mr. Ratts. (Tr. at 294).

25.    Thereafter, Mr. Ratts returned to his mother's condominium and continued to spend the vast majority of his time in bed. (Tr. at 33-34, 52, 255).

## B.    The Events of February 7, 2005

26.    On February 7, 2005, at 3:02 p.m., Mr. Ratts' mother, Mrs. Ratts, called 911. (Tr. at 36, 102).

27.    Paramedics arrived at Mrs. Ratts' condominium at 3:08 p.m. (TX 3).

28.    At 3:10 p.m., the paramedics put him on oxygen, and hooked him up to a pulse oximeter. (Tr. at 89). The pulse oximeter reflected an oxygen saturation level of 84 percent. (*Id*. at 105; *see also* TX 3). An EKG indicated that Mr. Ratts was experiencing sinus tachycardia (140 beats per minute) with no irregular heartbeat. (*Id*. at 117; TX 3). At the same time, Mr. Ratts' blood pressure was 130/117. (TX 3).

29.    Captain Daniel Linderman ("Captain Linderman") was one of the paramedics who responded to the 911 call.

30.    Captain Linderman received his education, training and state certification in 1984. (Tr. at 71).  He testified that as part of his education and training as a paramedic, he learned to differentiate between the signs and symptoms of a pulmonary embolism from those of a heart attack.  (Tr. at 76).  He has encountered patients exhibiting the signs and symptoms of a pulmonary embolism over the years, but has, by far, treated more patients exhibiting the signs and symptoms of a heart attack.  (Tr. at 77).

31.    Captain Linderman arrived on the scene at 3:13 p.m., and testified that when he first encountered Mr. Ratts, "Mr. Ratts was sitting on the bed, clutching his chest, very pale, almost ashen gray from the shoulders on up, sweaty, clutching his chest, talking in very short sentences, complaining of sudden onset of chest pain and shortness of breath, very anxious, very agitated by his movements."  (Tr. at 81-82, 103, 107).

32.    Mr. Ratts informed Captain Linderman that he had "fallen several days prior and had fractured a couple of vertebrae."  (Tr. at 83).

33.    Mr. Ratts stated that the oxygen was not helping him.  He quickly became unresponsive and then lost consciousness as he was being moved to the ambulance.  (*Id*. at 84).

34.    The paramedics started CPR, intubated him, and administered epinephrine and atropine.  (*Id*. at 84, 91).

35.    The run sheet reflects that at 3:20 p.m., Mr. Ratts had no blood pressure or pulse.

His oxygen saturation level had fallen to 70 percent despite the administration of 100 percent oxygen.  (*Id.* at 91; TX 3).

36.    The paramedics left Mrs. Ratts' condominium headed for St. Vincent's Hospital at 3:21 p.m.  (*Id.* at 103).

37.    By 3:30, Mr. Ratts' oxygen saturation level had fallen to 64 percent.  Mr. Ratts continued to have no blood pressure or pulse.  (Plaintiff's Ex. 3).

38.    Upon arrival at St. Vincent's Hospital emergency department at 3:42 p.m., Mr. Ratts was cared for by Dr. Adam Sharp ("Dr. Sharp"), the emergency room physician.  Captain Linderman informed Dr. Sharp of Mr. Ratts' symptoms and told him that he believed that Mr. Ratts was suffering from a pulmonary embolism. (Tr. at 94-95, 169).

39.    Dr. Sharp testified that he believed Mr. Ratts presented with the classic signs and symptoms of massive pulmonary embolism.  (Tr. at 148, 150).  Accordingly, Dr. Sharp administered TNKase, a very sophisticated thrombolytic, through an IV push, as a "last ditch effort" to save Mr. Ratts' life.  (Tr. at 147-48).

40.    Believing any more attempts to save Mr. Ratts' life to be futile, Dr. Sharp stopped treatment and declared him dead at 4:16 p.m.  (Tr. at 169).

41.    Ms. Inglis testified that an autopsy was not performed on Mr. Ratts because "it didn't seem to be necessary."  (Tr. at 257).

### III.    The Cause of Death

#### A.    The Death Certificate

42.    The Coroner of Marion County, Indiana, concluded that the cause of Mr. Ratts death was arteriosclerotic cardiovascular disease with a significant contributing factor of diabetes mellitus.  (Tr. at 649).

43.    The death certificate was completed by the coroner, Kenneth Ackles, D.C.  (*Id*.).

44.    Dr. Ackles has no training in death investigation or in medicine with regard to cause of death.  (Tr. at 374).

45.    Dr. Ackles' training and experience as a chiropractor is not sufficient to qualify him to render a meaningful opinion as to Mr. Ratts' cause of death in this case. This is particularly true in light of the fact that no autopsy was performed and none of Mr. Ratts' treating healthcare providers were contacted regarding the cause of Mr. Ratts' death.  Further, the medical records from St. Vincent Hospital that Dr. Ackles would have had access to indicated that Dr. Sharp believed that Mr. Ratts had suffered death from a pulmonary embolism.  As a result, the court finds that the cause of death contained in the death certificate is of little probative value in the determination of what the likely cause of death was for Mr. Ratts.

#### B.    A Pulmonary Embolism Vs. a Heart Attack

46.    Both heart attacks and pulmonary embolisms involve clots that cause an occlusion in an artery in the heart.  A clot that blocks the coronary artery causes a heart attack. (Tr. at 211).  A clot that blocks the pulmonary artery causes a pulmonary

embolism.  (Tr. at 211-12).

47.  With respect to a heart attack, the clot typically forms from plaque that has ruptured in the wall of the coronary artery; with respect to a pulmonary embolism, the clot forms in another location – typically in the deep veins of the leg – and travels to the pulmonary artery.  (Tr. at 212, 226).

48.  The classic symptoms of one suffering from a heart attack are shortness of breath, chest pain, anxiousness, and diaphoresis (profuse sweating).  (Tr. at 184, 682). Typically, one's heart rhythm (as shown by EKG rhythm strips) is irregular, but one's heart rate is normal.  (Tr. at 89-90, 360).  In addition, heart attack victims typically exhibit a "worsening complaint pattern," or experience symptoms that come and go over a period of time and then suddenly worsen.  (Tr. at 156).  Dr. Sharp testified that in his experience, heart attack victims generally do not present with a rapid onset of symptomatology without evidence of EKG rhythm strip changes.  (*Id*.).

49.  The classic symptoms of one suffering from a pulmonary embolism include:

    a.  a sudden onset of shortness of breath that may be accompanied by chest pain (Tr. at 87, 151, 299, 358, 627);

    b.  a rapid, but normal, heart rate (as sinus tachycardia) (Tr. at 89-90, 155, 299, 359-60);

    c.  anxiety (Tr. at 627);

    d.  diaphoresis (Tr. at 151);

e.      a decrease in oxygen saturation despite the administration of 100% oxygen

        (Tr. at 87, 151-52, 361, 627-28);

f.      a sudden decrease in activity (as compared to one's baseline of activity)

        following an injury (Tr. at 87, 151, 160, 296, 363-64, 619-20, 623).

50.   In addition, the EKG of one experiencing a pulmonary embolism will typically

      indicate a sinus tachycardia with a regular heart rhythm.  (Tr. at 155, 360).

### C.      Mr. Ratts' Health History

51.   At the time of his death, Mr. Ratts was 56 years old, was morbidly obese and had

      been diagnosed with hypertension, diabetes mellitus, and hyperlipidemia.  (Tr. at

      453-55, 459).  In addition, Mr. Ratts had a family history of heart disease on both

      his mother's and father's side of the family.  (Tr. at 557, 614-15).  All of these

      conditions put him at risk for developing heart disease and for suffering a heart

      attack.[2]  (Tr. at 453-55).

52.   However, at the time of Mr. Ratts' death, there was no pre-existing clinical

      evidence, signs, or symptoms that Mr. Ratts' suffered from coronary artery disease

      or clinical heart disease.  (Tr. at 357-58, 588).

---

[2] In fact, Mr. Ratts had six out of the seven risk factors for a heart attack (age, family history, diabetes, obesity, hyperlipidemia, hypertension).  (Tr. at 459-60, 561-62, 587-88, 615-16).  The seventh factor commonly listed is smoking.  Mr. Ratts was not a smoker.  (Tr. at 562, 588).

### D.     Medical Testimony

#### 1.     Adam Sharp, M.D.

53.   Dr. Adam Sharp ("Dr. Sharp") has been a board certified emergency room

physician since the fall of 2002.  (Tr. at 135).

54.   Dr. Sharp testified that he treats patients suffering from a life-threatening heart

attack approximately once every three weeks, and treats patients suffering from a

significant pulmonary embolism approximately once a month.  (Tr. at 137-38).

55.   Dr. Sharp testified that, in his experience, Mr. Ratts "just looked like a PE

[pulmonary embolism]."  (*Id*. at 150).  He explained:

> [I]n this case in particular, there was a history of recent injury
> that had led to him being more incapacitated than his baseline.
> And on top of that, there was the story of the incredibly
> abrupt onset of symptomatology, the complaint of shortness
> of breath, the diaphoresis, the chest pressure, the fact that he
> then rapidly decompensated, the fact that the rhythm strips
> from the field did not show a cardiac process. . .  It just – he
> was a PE. . .  His heart rate was 140.  That is a clear indicator
> of an acute process, could be cardiac, could be pulmonary, but
> an acute process nonetheless.  His respiratory rate was 24,
> which is elevated . . .  And his [oxygen saturation] was 84
> percent. . .  That is an indicator that there's an acute
> pulmonary process going on.

(*Id*. at 150-53).  Given these signs and symptoms, Dr. Sharp testified that any

emergency room doctor would agree that Mr. Ratts died of a pulmonary embolism.

"This isn't rocket science."  (Tr. at 230-31).

56.   In Mr. Ratts' February 7, 2005, medical records from St. Vincent's Hospital, Dr.

Sharp wrote that he had a "strong suspicion" that Mr. Ratts died of a pulmonary

12

embolism.  (TX 6).  Upon further questioning, Dr. Sharp explained, "In the world of medicine when you say you're strongly suspicious that something is going on, it means you think it's going on and you're pretty darn sure. . ."  (Tr. at 238-39).

57.   Dr. Sharp testified that Mr. Ratts' hypertension and diabetes were not relevant to his diagnosis and treatment of Mr. Ratts on February 7, 2005.  (Tr. at 159-60).  Dr. Sharp found Mr. Ratts' injury and subsequent immobility were more relevant to Dr. Sharp's treatment than Mr. Ratts' obesity.  (Tr. at 160, 221).

58.   Dr. Sharp could not be completely certain that Mr. Ratts died of a pulmonary embolism because an autopsy was not performed following his death.  (Tr. at 238).

### 2.   John Pless, M.D.

59.   Dr. John Pless ("Dr. Pless") is a forensic pathologist who was retained by the Plaintiff in this case to give his opinion as to Mr. Ratts' cause of death.

60.   Dr. Pless finished his fellowship in forensic pathology in 1971.  In 1983, he joined the faculty of the Indiana University School of Medicine as the Director of the Forensic Pathology Division.  (Tr. at 349).  He retired in 2003.  (*Id.*).

61.   Dr. Pless has participated in 15,000-20,000 death examinations and has testified as an expert in forensic pathology more than 1,000 times.  (Tr. at 349-50).

62.   Dr. Pless testified that Mr. Ratts likely suffered a pulmonary embolism because he exhibited the following signs and symptoms: a sudden onset of shortness of breath and chest pain, and an oxygen saturation level of 84 percent despite a blood pressure of 130/117, a heart rate of 140, and an EKG that did not show any

indication of abnormal heart rhythm.  (Tr. at 358-59).

63.     Dr. Pless testified that the pulmonary embolism likely resulted from the

significant decrease in activity that Mr. Ratts experienced following the slip and

fall of January 20, 2005, as well as the lumbar fracture itself that Mr. Ratts

sustained as a result of the slip and fall.  (Tr. at 363; *see also* Tr. at 364 ("But for

the fracture, in my opinion, there would be no death. . .  Because it's the one thing

if we could remove, Mr. Ratts would be active and moving around as he had

always done in his life.")).

64.     Dr. Pless explained that any time the body is injured, the body seeks to repair itself

by producing an outflow of inflammatory cells and proteins, which activate the

"coagulation cascade."  (*Id*.).  Thus, an injury such as a lumbar fracture increases

one's likelihood of developing a pulmonary embolism.  (*Id*.).  Moreover, "anytime

anyone is immobile or tends to protect a certain part of the body by lack of

movement because of pain, there will be a stasis in veins leading to the increased

likelihood of thrombosis."  (*Id*.).

65.     Further, Dr. Pless testified that Mr. Ratts' hypertension, hyperlipidemia, and

diabetes did not put him at any increased risk of having a pulmonary embolism.

(Tr. at 365-66).  Dr. Pless discounted the fact that Mr. Ratts was obese in

formulating his opinion because "his obesity is something that he lived with for

many, many years and he hadn't had any clots or thromboemboli.  The only one

thing that is present that promotes the development of that in Mr. Ratts is the

fracture."  (Tr. at 364-65).

66.    Dr. Pless did not believe that Mr. Ratts suffered from a heart attack, even though

he had six out of the seven risk factors for a heart attack, because "he had no

symptoms of coronary artery disease."  (Tr. at 460).  Dr. Pless explained:

> His pain was not localized like a typical coronary . . .  He had
> a pulse that was highly elevated, almost twice what it should
> be at rest; whereas in a heart attack, the pulse is usually
> normal to slow.  There were no EKG changes of a [heart
> attack].  He had no evidence of any abnormal heart rhythm.
> Oxygen did not improve his saturation or his pain, and despite
> cardiac arrest, they were able to get electrical activity in the
> heart."

(Tr. at 467).

### 3.    John Denton, M.D.

67.    Dr. John Denton ("Dr. Denton") is a forensic pathologist who was retained by

LINA in this case to give his opinion as to Mr. Ratts' cause of death.  He is board

certified in anatomic, clinical, and forensic pathology.  (Tr. at 640).

68.    Dr. Denton finished his residency in forensic pathology in 1996 from the

University of Arizona at Tuscon.  (Tr. at 639).  Following his residency, he

received additional training at the Cook County Medical Examiner's Office in

Chicago, Illinois.  (*Id.*).  From 1996-2005, he served as deputy medical examiner,

and in 2006, became chief medical examiner.  (Tr. at 644).   He currently serves a

chief forensic pathologist in McLean County, Illinois.  (Tr. at 645).

69.    Dr. Denton has participated in "a couple thousand" death examinations involving

either a pulmonary embolism or a heart attack, and has testified as an expert in

forensic pathology between 250 and 300 times  (Tr. at 646-67).

70.    Dr. Denton testified that Mr. Ratts died from arteriosclerotic cardiovascular

disease (a heart attack) with diabetes mellitus as a contributing factor in his death.

(Tr. at 649).

71.    Dr. Denton testified that there was no evidence of pre-existing coronary artery

disease in Mr. Ratts' medical records; thus, his opinion as to the cause of death of

Mr. Ratts is based entirely on the fact that Mr. Ratts had six out of the seven risk

factors for coronary artery disease.  (Tr. at 720).

72.    In addition, Dr. Denton testified that he saw no evidence that Mr. Ratts suffered

from a pulmonary embolism.  (Tr. at 687).

73.    Dr. Denton testified that there are primarily three signs and symptoms of a

pulmonary embolism: (1) asymmetrical swelling in the lower leg and calf; (2) a

prior history of a pulmonary embolism; and/or (3) prior pulmonary infarcts.  (Tr. at

726).  Given the prior evidence of record, the court finds this testimony

unpersuasive.

74.    Further, with respect to asymmetrical swelling in the lower leg or calf as a sign of

a blood clot that may lead to a pulmonary embolism, the court is persuaded by the

testimony of Dr. Sharp, who testified that in his experience, only 25 percent of

those who experience a pulmonary embolism have leg swelling.  (Tr. at 206).  Dr.

Sharp also testified that given Mr. Ratts' weight, "the odds of actually seeing leg

swelling, . . ., would have been slim to none." (Tr. at 207). In addition, Dr. Pless testified that the pulmonary embolism that caused Mr. Ratts' death likely originated in his thigh. (Tr. at 367). As a result, the court finds that the absence of calf swelling in Mr. Ratts does not make the existence of a pulmonary embolism any less likely, as it likely originated above the knee.

75.    Dr. Denton testified that up to 14 days from injury to death would be consistent with a pulmonary embolism. Here, the time between the slip and fall and Mr. Ratts' death was 18 days. (Tr. at 719). The court is not persuaded by this testimony. Dr. Olp, who saw Mr. Ratts 15 days after the slip and fall, testified that he was definitely at risk for a pulmonary embolism at that time because of the fracture from the slip and fall, as well as the inactivity that resulted from it. (Tr. at 296). Further, Dr. Strate testified that Mr. Ratts was at risk for developing a pulmonary embolism because of the blunt force injury to his back, as well as his level of inactivity that resulted from it. (Tr. at 584). Moreover, Dr. Pless testified that 18 days between the time of Mr. Ratts' fall and his death was certainly within the allowable time period for the diagnosis of pulmonary emboli because the process of developing pulmonary emboli can occur at any time during the healing phase of a fracture or injury and it takes most fractures about six to eight weeks to become relatively healed. (Tr. at 371).

76.    Dr. Denton testified that Mr. Ratts was not at risk for developing a pulmonary embolism because he was not completely bedridden following the slip and fall.

17

(Tr. at 735).  The court is not persuaded by this testimony.  First, in expressing his opinion, Dr. Denton was not aware of the evidence that indicated that Mr. Ratts was in bed 22-23 hours out of each day following the slip and fall.  (Tr. at 735).  Second, the testimony of four other doctors presented by the Plaintiff was at odds with Dr. Denton's opinion.  Dr. Sharp testified that Mr. Ratts was at risk for developing a pulmonary embolism because he was acutely more sedentary than his normal baseline of activity, and Dr. Pless explained that such immobility caused a stasis in the veins leading to a thrombosis.  (Tr. at 160, 363-64).  In addition, Mr. Ratts' treating physicians, Dr. Olp and Dr. Strate, testified that Mr. Ratts was at risk for a pulmonary embolism due to his back injury which caused him to be immobile for long periods of time.  (Tr. at 296, 584).  Thus, the fact that Mr. Ratts was not bedridden 24 hours a day does not decrease the likelihood of him developing a thrombosis.

77.     For the reasons set forth above, the court credits the testimony of Dr. Sharp, Dr. Olp, Dr. Strate, and Dr. Pless over that of Dr. Denton.

## CONCLUSIONS OF LAW

78.     To the extent any of the foregoing findings of fact is a conclusion of law, it is hereby adopted as a conclusion of law.  To the extent any of the conclusions of law set forth below is a finding of fact, it is hereby adopted as a finding of fact.

79.     The court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332.  Thus, the court must apply the substantive law of the forum state.  *Palace*

18

*Entm't, Inc. v. Bituminous Cas. Corp.*, 793 F.2d 842, 843 (7th Cir. 1986) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938)).  The forum state in this case is Indiana; consequently, Indiana state substantive law controls the facts of this case. *Id*.

### A.   Indiana Insurance Law

80.   The interpretation of an insurance contract is a question of law.  *Tate v. Secura Ins.*, 587 N.E.2d 665, 668 (Ind. 1992).

81.   The insured bears the burden of proof that she is entitled to coverage under the applicable insurance policy. *United Capitol Ins. Co. v. Special Trucks, Inc.*, 918 F.Supp. 1250, 1255 (N.D. Ind. 1996) (applying Indiana law); *South Bend Comm. Sch. v. Nat'l Educ. Ass'n*, 444 N.E.2d 348, 352 (Ind. Ct. App. 1983).  The insurer, on the other hand, bears the burden of proof that any exclusions in the policy apply. *United Capitol*, 918 F.Supp. at 1255; *Zebrowski and Assoc., Inc. v. City of Indianapolis*, 457 N.E.2d 259, 262 (Ind. Ct. App. 1983).

82.   The applicable burden of proof in this case is by a preponderance of the evidence, which means the facts sought to be true are more likely than not true.  *Stout v. Farmers Ins. Exch.*, 881 F.Supp. 401, 405 (S.D. Ind. 1994); *Palace Entm't*, 793 F.2d at 843.

83.   Policy terms are interpreted from the perspective of an ordinary policyholder of average intelligence.  *Burkett v. Am. Family Ins. Co.*, 737 N.E.2d 447, 452 (Ind. App. 2000).  If the policy language is clear and unambiguous, the court must give

the language its plain and ordinary meaning.  *Id.*  If reasonable persons would differ as to the meaning of the policy language, the policy is ambiguous.  *Id.*; *Bosecker v. Westfield Ins. Co.*, 724 N.E.2d 241, 244 (Ind. 2000).  Ambiguous terms in an insurance policy are construed against the insurer, particularly where, as here, the policy excludes coverage.  *Hoosier Ins. Co. v. Audiology Foundation of America*, 745 N.E.2d 300, 307 (Ind. Ct. App. 2001).

**B.     The Applicable Policy Provisions**

84.   The LINA Policy provided that "[LINA] will pay the benefit for any one of the Covered Losses listed in the *Schedule of Benefits*, if the Covered Person suffers a Covered Loss resulting directly and independently of all other causes from a Covered Accident within the applicable time period specified in the Schedule of Benefits."  (TX 8 at 19).

85.   The Policy also provides that "[c]ertain words capitalized in the text of [the Policy] have special meanings within [the] Policy and are defined in the *General Definitions* section.  Please read these and the Common Exclusions sections in order to understand all of the terms, conditions and limitations applicable to [the Policy's] coverage and benefits."  (*Id.*).  Therefore, in order to determine whether Ms. Inglis is entitled to payment of accidental death benefits by LINA, the definitions of "Covered Person," "Covered Accident," and "Covered Loss" contained in the Policy must be examined, as well as the contents of the "Common Exclusions" section of the Policy.

86.   The *General Definitions* section of LINA's Policy defines "Covered Person" as follows:

> An eligible person, as defined in the Schedule of Benefits, for whom an enrollment form has been accepted by Us and required premium has been paid when due and for whom coverage under this Policy remain in force.  The term Covered Person shall include, where this Policy provides coverage, an eligible Spouse/Domestic Partner and eligible Dependent Children.

(TX 8 at 6).

87.   Brian Billeter, LINA's claim manager and decisionmaker in the claim at issue, testified that at the time of the slip and fall on January 20, 2005, through and including the time of his death on February 7, 2005, Mr. Ratts was a "Covered Person" pursuant to LINA's Policy.  (Tr. at 513).  Mr. Ratts was an eligible person because he was a full-time, active employee of Indiana University.  (Tr. at 513-14).  Further, his enrollment form had been accepted by LINA and the required premium paid when due.  (Tr. at 514).

88.   The *General Definitions* section of LINA's Policy defines "Covered Accident" as follows:

> A sudden, unforeseeable, external event that results, directly and independently of all other causes, in a Covered Injury or Covered Loss and meets all of the following conditions:
>
> 1.   occurs while the Covered Person is insured under this Policy;
> 2.   is not contributed to by disease, Sickness, mental or bodily infirmity;
> 3.   is not otherwise excluded under the terms of the Policy.

(TX 8 at 6).

89.  The slip and fall on ice that Mr. Ratts experienced on January 20, 2005, was a sudden, unforeseeable, external event within the Policy definition of "Covered Accident" contained in LINA's Policy.  There is no evidence in the record stating otherwise.

90.  The slip and fall occurred while Mr. Ratts was an insured under LINA's Policy. (Tr. at 513-14).

91.  There is no evidence that the slip and fall was contributed to by disease, sickness, mental or bodily infirmity pursuant to LINA's Policy.  (TX 8).

92.  Thus, because the slip and fall resulted in a "Covered Loss" as discussed herein, the slip and fall on ice that Mr. Ratts experienced on January 20, 2005, was a "Covered Accident" pursuant to LINA's Policy.

93.  The *General Definitions* section of LINA's Policy defines "Covered Loss" as follows:

> A loss that is all of the following:
>
> 1.  the result, directly and independently of all other causes, of a Covered Accident;
> 2.  one of the Covered Losses specified in the *Schedule of Covered Losses*;
> 3.  suffered by the Covered Person within the applicable period specified in the *Schedule of Benefits*.

(TX 8 at 6).

94.  There is no dispute that elements 2 and 3 above have been satisfied.  Mr. Ratts'

death is one of the "Covered Losses" specified in the *Schedule of Covered Losses* pursuant to LINA's Policy. (TX 8 at 4). Mr. Ratts' death occurred within the applicable time period (death within 365 days of the fall) specified in the *Schedule of Benefits* pursuant to LINA's Policy. (TX 8 at 3).

95. With respect to disputed element 1, the court finds that the evidence demonstrates that the slip and fall, more likely than not, resulted directly and independently of all other causes in Mr. Ratts' death. Specifically, the preponderance of the evidence demonstrates that Mr. Ratts: (1) sustained a back injury as a result of the slip and fall on January 20, 2005; (2) as a direct result of the slip and fall and resulting back injury, Mr. Ratts experienced a significant decrease and limitation of his activity level (as compared to before the fall) and spent the vast majority of his time in bed; and (3) as a direct result of the slip and fall and the resulting lumbar fracture, as well as the resulting inactivity caused by it, it is more likely than not that Mr. Ratts experienced a pulmonary embolism that caused his death on February 7, 2005.

96. The *Common Exclusions* section of LINA's Policy provides, in relevant part, as follows:

> In addition to any benefit-specific exclusions, benefits will not be paid for any Covered Injury or Covered Loss which, directly or indirectly, in whole or in part, is caused by or results from any of the following unless coverage is specifically provided for by name in the *Description of Benefits* Section:
> . . .

23

7.      Sickness, disease, bodily or mental infirmity,

. . .

(TX 8 at 12).

97.    The court finds that LINA has not proven, by a preponderance of the evidence, that this exclusion applies.  Although at the time of Mr. Ratts' death, Mr. Ratts had been diagnosed with hypertension, diabetes mellitus, hyperlipidemia, and obesity (Tr. at 453-54) – conditions which put him at risk for heart disease or for suffering a heart attack – the evidence does not demonstrate that, more likely than not, Mr. Ratts died from heart disease or a heart attack.  Rather, the preponderance of the evidence demonstrates that Mr. Ratts likely died from a pulmonary embolism.

## CONCLUSION

98.    In conclusion, the court finds that Mr. Ratts was a "Covered Person" and that his death was a "Covered Loss" resulting directly and independently of all other causes from a "Covered Accident" within the applicable time period specified in the *Schedule of Benefits*.  Specifically, the evidence does not demonstrate that Mr. Ratts' death was more likely than not the result of a heart attack or caused by heart disease, nor does the evidence demonstrate that his hypertension, diabetes mellitus, hyperlipidemia, or obesity more likely than not caused or contributed to his death. The court further finds that none of the *Common Exclusions* contained in LINA's Policy apply to this matter.

99.     Accordingly, the court hereby finds that the Plaintiff, Phyllisanne Inglis, as Trustee

of the David M. Ratts Living Trust, Deceased, is entitled to payment in the amount

of $240,000.00 pursuant to LINA's Policy.  Judgment will be entered in Plaintiff's

favor in a separate document.


**SO ORDERED** this <u>14th</u> day of May 2008.

_____
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana


Electronic Copies to:

Timothy Charles Caress
CLINE FARRELL CHRISTIE LEE & CARESS
tim@cfclc-law.com

Jennifer Jay Kalas
HINSHAW & CULBERTSON
jkalas@hinshawlaw.com

Renee J. Mortimer
HINSHAW & CULBERTSON
rmortimer@hinshawlaw.com

Daniel Keenan Ryan
HINSHAW & CULBERTSON
dryan@hinshawlaw.com